# IN THE COURT OF APPEALS OF IOWA

No. 24-1184
Filed October 15, 2025

**STATE OF IOWA,**
  Plaintiff-Appellee,

**vs.**

**RYAN GREGGORY ETHIER,**
  Defendant-Appellant.
_____

  Appeal from the Iowa District Court for Woodbury County, Jeffrey A. Neary, Judge.

  A criminal defendant appeals his conviction for stalking. **AFFIRMED.**

  Gary Dickey of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for appellant.

  Brenna Bird, Attorney General, and Olivia D. Brooks, Assistant Attorney General, for appellee.

  Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.

**BULLER, Judge.**

Ryan Ethier appeals his conviction for stalking Michael W., the mother of his child, in violation of a protective order.  Ethier argues he did not purposefully engage in a course of conduct covered by the stalking statute.  We, like the district court who served as fact-finder at Ethier's bench trial, disagree.  We affirm.

## I.    Background Facts and Proceedings

Ethier dated Michael for about six months.  At first, Michael thought Ethier was nice, and she had no concerns about his drug use or mental health.  But after Michael unexpectedly became pregnant, Ethier's behavior dramatically changed.  Ethier "got really upset," insisted the child wasn't his, and demanded that Michael get a paternity test.  When Michael did not immediately agree, Ethier—as Michael described it—"flipped out and he was not happy.  And he said you're going to go, and he made the appointment and made me go."  Ethier physically forced Michael into the car and to a paternity-testing appointment in Omaha.  She ultimately complied with the test because she was concerned for her safety, and Ethier said he would leave her stranded in Omaha if she didn't.  Testing established the child was Ethier's.

Michael broke up with Ethier before Christmas of 2021.  In Michael's words, Ethier became "mentally unstable."  He began threatening her more explicitly and frequently; Michael blocked Ethier's number from her phone because he text-messaged her thirty-to-sixty times in the middle of night.  Michael described some of the messages as "death threats."  In total, Michael had to block more than thirty numbers and several email addresses because Ethier kept using different means to contact, harass, and threaten her.

More than once, Ethier pointed a 9mm handgun at Michael's head and threatened to pull the trigger. On one occasion, he pulled the trigger while it was pressed against her head. Ethier also threatened to shoot himself. He threatened to crash while driving with Michael, which he "hoped" would also kill her and their unborn child. And he threatened to kill Michael and take the child to Germany once the child was born. Ethier also communicated threats about Michael to her family members, which led those family members to also fear for Michael's safety.

Many of the threats involved religious or pseudo-religious vocabulary. Both Michael and Ethier hold pagan beliefs. However, according to Michael, Ethier's beliefs differed in that he adhered to a sect associated with white supremacy and "more of what Hitler followed."

On Christmas Eve at Ethier's parents' house, Ethier kept harassing Michael and even lunged at her. Ethier's family intervened, and a family member had to use a TASER on Ethier and drag him out of the house to end the conflict.

In February 2022, Michael petitioned for civil relief from domestic abuse. She included a detailed timeline and recitation of Ethier's text messages and conduct, consistent with what she later recounted at trial.[1] She said, "I am scared for my life" and "afraid if I piss him off enough or if he has a bad night he will kill me." In her view, Ethier was "extremely dangerous" and she was "deathly afraid of him for [her]self and [her] children." The district court entered a no-contact order prohibiting Ethier from contacting Michael from February 17 onward.

---

[1] There was some ambiguity around dates in Michael's trial testimony, but that inconsistency is immaterial. She cried while testifying at trial and explained: "He violated [the protective order] so many times, I can't keep it straight."

While the civil no-contact order was in place, Ethier continued to contact Michael. He stipulated to reports of three no-contact violations that were eventually charged by law enforcement:

- On July 11, Ethier showed up at Michael's home and banged on the door until Michael's family called the police. This was captured on video surveillance. When police spoke with Ethier, he admitted to knowing about the no-contact order and said he wanted to speak with Michael anyway.

- On July 28—the day after he was released from jail on the previous violation and a related drug charge—Ethier sent Michael a photo of runes carved into his body that Michael explained communicated a death threat in their shared religious tradition.

- On August 2—the day after his release on the July 28 charge—Ethier sent additional text messages to Michael that included various religious statements.

By the time Michael gave birth to her and Ethier's child, she was so afraid of Ethier she gave birth under an assumed name. Despite this, Ethier still showed up at her house less than twenty-four hours after her discharge from the hospital, "banging on [her] door" until she called police. At this point, the police also were concerned about Ethier "hurting" Michael.

In April of 2023, one of Michael's neighbors saw Ethier throwing rune tiles onto Michael's property from the sidewalk. Michael was home at the time but did not know about the rune tiles until later. Michael testified that Ethier was using some of the runes incorrectly or in a nonsensical way, but that the intended message was "ill intent"—"I know he's doing it out of harm. I know he is doing it and misinterpreting all the positive things out of the religion. And he's only doing it thinking that they're going to harm me and my children." As a result of these acts, a criminal no-contact order was entered on April 17.

In July, police twice found Ethier outside Michael's house "screaming" so loudly it upset the neighbors and their children. When Ethier spoke to police regarding these events, he ranted and raved about Michael. He said she "needs to be broken" and "needs to learn her fucking lesson." A neighbor also saw Ethier at Michael's door on other dates that did not result in criminal charges.

Even after he was arrested and detained in jail pending trial, Ethier used other inmates' calling cards to repeatedly call Michael's cell phone. When she received these calls, Michael began "shaking and hung up [her] phone and started freaking out." Ethier also attempted to mail Michael a letter written on a Christmas card, but jail staff intercepted it before it was sent out for delivery. In the portion of the letter addressed to Michael, Ethier wrote: "I'm violating the protection order again I don't give a fuck I just want to see my daughter." And in a recorded jail call made to his mother, Ethier remarked it was unfair he was charged with felony stalking when he "didn't even fucking hit the bitch." He said he "could watch her burn alive and not give a fuck."

A forensic psychologist who had previously evaluated Ethier's competence testified on his behalf at trial. She said she could not offer any opinion as to his mental state when he committed criminal acts, but she opined that he suffered from methamphetamine-induced psychosis and possible schizoaffective disorder. A jailer opined that, during the nine months he was in jail, Ethier had not displayed any evidence of delusions or psychosis; to the contrary, he had been a jail trustee with special privileges until he got caught gambling.

Ethier also testified. He admitted to being "irritated" with Michael and said she "robbed [him] of fatherhood." He said he disagreed with some of what others

had reported about his behavior, but he was not specific with his denial. And he agreed that, when he engaged in some of the charged behaviors, he felt rejected and angry. He said he kept contacting and messaging Michael because he "wanted her to respond." At a few points, he described himself going "off the rocker" or "going off the rails on a crazy train." He agreed this could or would have scared Michael. In the end, he said he didn't "blame" Michael for the no-contact order against him, and he acknowledged his acts "probably more than likely" violated the order.

Ethier waived a jury trial, and after a bench trial the district court found him guilty of stalking in violation of a protective order, a class "D" felony in violation of Iowa Code section 708.11(3)(b)(1) (2023). At a contested sentencing hearing, the victim gave an impact statement[2] explaining that Ethier continued to contact her even after the guilty verdict. The court sentenced Ethier to prison, and he appeals.

## II.    Standard of Review

We review sufficiency-of-the-evidence claims for correction of errors at law. *See State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). "In determining whether the [factfinder]'s verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (citation omitted). We do not require corroboration of victim testimony, nor do we substitute our view of the evidence for that of the factfinder.

---

[2] We observe that the district court placed the victim under oath before she gave her victim impact statement. But Iowa Code section 915.21(3) provides: "A victim shall not be placed under oath . . . at the sentencing hearing."

*State v. Hernandez*, 20 N.W.3d 502, 507–08 (Iowa Ct. App. 2025) (en banc); Iowa R. Crim. P. 2.21(3).

### III.    Discussion

To evaluate Ethier's challenge, we look first to the statute.  The act of stalking requires proof of two elements:

> [1] The person purposefully engages in a course of conduct directed at a specific person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened or to fear that the person intends to cause bodily injury to, or the death of, that specific person or a member of the specific person's immediate family.
> [2] The person has knowledge or should have knowledge that a reasonable person would feel terrorized, frightened, intimidated, or threatened or fear that the person intends to cause bodily injury to, or the death of, that specific person or a member of the specific person's immediate family by the course of conduct.

Iowa Code § 708.11(2).  Ethier challenges only the first element, whether he "purposefully engage[d] in a course a conduct" governed by the statute.

As to mens rea, stalking is a general-intent crime.  *State v. Neuzil*, 589 N.W.2d 708, 711–12 (Iowa 1999).  The "focus is not on the defendant's mental state but on the result defendant's purposeful acts cause in a reasonable person." *Id.* at 711.  The crime does not require "the stalker actually intended to cause fear in the victim," only that "the stalker consciously engaged in conduct that he knew or should have known would cause his victim to be afraid." *Id.* (emphasis omitted). This interpretation—requiring only general intent—ensures stalkers cannot "avoid conviction by asserting an emotional inability to form the requisite specific intent." *Id.* at 712.

As to actus reus, "course of conduct" is a term of art and means "repeatedly maintaining a visual or physical proximity to a person without legitimate

purpose, . . . repeatedly conveying oral or written threats, threats implied by conduct, or a combination thereof, directed at or toward a person." Iowa Code § 708.11(1)(b). And "repeatedly" means "on two or more occasions." *Id.* § 708.11(1)(d).

Viewed in the light most favorable to the State, we have little trouble concluding that Ethier knew or should have known that his acts—the threats, the incessant messaging and calling, the photographs, and the runes—were a course of conduct he knew or should have known would cause Michael to fear bodily injury or death. Ethier largely admitted this at trial. And we conclude these acts amount to a course of conduct as defined by statute. This is almost a textbook example of stalking: an extended series of repeat acts intended to terrorize the victim.

We single out one facet of Ethier's appellate argument for more discussion. He asserts that "multiple fear-inducing acts do not give rise to liability unless the offender intended the incidents to be a part of a course of conduct." We reject this assertion for two reasons. First, it is a thinly veiled attempt at revising the statutory elements to create a specific-intent, rather than general-intent, offense—which has already been rejected by the supreme court. *Neuzil*, 589 N.W.2d at 711–12. And second, it places the focus on the defendant's mental status, rather than the defendant's purposeful acts—which runs contrary to legislative intent and controlling precedent. *Id.* at 711. We do not believe the General Assembly intended that a stalker could immunize acts of stalking by claiming the individual threatening acts were not part of a broader course of conduct.

We decline to disturb Ethier's conviction and affirm.

**AFFIRMED.**